IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARI WALKER,

     Plaintiff,

v.

PIEDMONT URGENT CARE BY
WELLSTREET, LLC,

     Defendant.

CIVIL ACTION FILE NO.

1:22-cv-3145-SDG-JKL

## <u>ORDER AND FINAL REPORT AND RECOMMENDATION</u>

This is an employment case arising under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA"). Plaintiff Mari Walker alleges that her former employer, Defendant Piedmont Urgent Care by WellStreet, LLC ("WellStreet"), fired her for complaining that a coworker, Ashley Hampton, made disparaging remarks about other employees' sexual orientation and disability status. Defendant argues Plaintiff was not retaliated against, but rather fired because she was involved in an altercation with Hampton in violation of its workplace anti-violence policy. The case is before the Court on Defendant's motion for summary judgment [Doc. 39] and Plaintiff's motion to strike a declaration Defendant submitted in support of the summary judgment

motion. [Doc. 53.] For the reasons below, Plaintiff's motion to strike is **DENIED** and it is **RECOMMENDED** that Defendant's summary judgment motion be **GRANTED**.

## I.    MOTION TO STRIKE

The Court first takes up Plaintiff's motion to strike the declaration of Robin Stegall, which Defendant submitted in support of its summary judgment motion. [Doc. 53.] Stegall is a Human Resources ("HR") Business Partner for Defendant. In the declaration, Stegall authenticates a document, which shows the results of a background check conducted of Plaintiff when she began at Defendant. [*See* Doc. 51-1.] The document itself was produced in discovery.

Plaintiff urges the Court to strike Stegall's declaration under Federal Rule of Civil Procedure 37(c)(1) because Defendant failed to disclose Stegall as a person with discoverable information in its Rule 26(a) initial disclosures. [Doc. 53.] Defendant opposes the motion on the grounds that even though it did not identify Stegall by name in its initial disclosures, it identified "[a]ny custodian(s) and other individual(s) necessary to establish the admissibility of exhibits" and that there is prejudice to Plaintiff because Stegall's declaration was simply used as a vehicle to authenticate the background check produced to Plaintiff during discovery. [Doc. 54 at 1-2.]

2

Rule 37(c)(1) provides in pertinent part that a party may not use an unidentified witness to supply evidence on a motion, "unless the failure [to identify] was substantially justified or is harmless." Here, even if Defendant should have identified Stegall by name, the failure to do so was harmless because it submitted Stegall's declaration solely to authenticate a document produced in discovery. Indeed, Plaintiff does not challenge the authenticity of the document, or present any colorable basis to believe that Stegall is not competent to do so. Accordingly, Plaintiff's motion to strike [Doc. 53] is **DENIED**. *See Hayes v. Deluxe Mfg. Operations LLC*, No. 1:16-CV-02056-RWS-RGV, 2018 WL 1461690, at *4 n.5 (N.D. Ga. Jan. 9, 2018) ("Courts 'have held that where an affidavit of a previously undisclosed witness is exclusively used to authenticate documents already known to exist to a party, the fact that the witness was not previously disclosed is harmless and the affidavit may properly be considered by the court.'"), *report and recommendation adopted*, 2018 WL 1869825 (N.D. Ga. Feb. 21, 2018).

3

## II.     BACKGROUND

### A.     Facts[1]

#### 1.     Plaintiff's Employment

The Court now turns to the facts relevant to the pending summary judgment motion.  In July 2020, Plaintiff began working for WellStreet as a *pro re nata* ("PRN")[2] clinical service representative ("CSR") at its Ponce De Leon Center (the "Center").  (DSMF ¶¶ 26-27.)  CSRs help provide administrative functions and routine clinical procedures.  (DSMF ¶ 8.)  Practice managers have direct oversight over CSRs, and may discipline and terminate employees with approval from HR. (DSMF ¶ 13.)

---

[1] In setting out the facts of this case, the Court has considered Defendant's Statement of Material Facts ("DSMF" [Doc. 39-2]), Plaintiff's Response to DSMF ("R-DSMF" [Doc. 49]), Plaintiff's Statement of Additional Material Facts ("PSMF" [Doc. 47-3]), and Defendant's Response to PSMF, ("R-PSMF" [Doc. 52]).  The Court has also conducted its own review of the record.  *See* Fed. R. Civ. P. 56(c)(3).  Citations that reference only paragraph numbers from a party's statement of facts or response thereto refer to the statements that are not disputed. Each supported fact will be deemed admitted unless properly disputed by the responding party.  *See* LR 56.1(B)(2), (3), NDGa.  When a statement or part of it is properly disputed, the Court will view the material evidence and factual inferences in the light most favorable to the nonmoving party and will, as appropriate, cite directly to the evidence supporting the Court's factual recitation.

[2] PRN employees provide services on an as-needed basis, do not have a regular weekly work schedule, and are ineligible for most company benefits. [Doc. 39-5 at 3-4; Doc. 39-6 at 99.]

When Plaintiff began work, she received Defendant's employee handbook and was trained on its policies and procedures.  (Pl. Dep. [Doc. 42] at 62-63.)  The employee handbook included a disciplinary policy with progressive steps of discipline from verbal coaching to written warnings to termination.  [Doc. 56-5 at 64-65, 90.]  It also explained that Defendant may skip steps depending on the situation and nature of the offense.  [*Id.* at 65.]  In a section entitled "Violence-Free Workplace," it explained that it would "be a violation of this policy for any individual to engage in any conduct, verbal or physical, which intimidates, endangers, or creates the perception of intent to harm persons or property."  [*Id.* at 64.]  Such conduct included "verbal conduct that is intimidating and has the purpose or effect of threatening the health or safety of a coworker."  [*Id.*]

## 2.      Plaintiff's Complaint About Hampton's Comments

In June 2021, Ashley Hampton joined the Center staff as a CSR.  (DSMF ¶ 32.)  In total, Plaintiff and Hampton worked together for around ten to fifteen shifts over the course of a five-week period.  (DSMF ¶ 34.)

According to Plaintiff, Hampton repeatedly made derogatory comments about a hearing-impaired coworker and a gay coworker.  (Pl. Dep. at 110.)  Specifically, Hampton remarked that (1) the hearing-impaired coworker talked too loudly, sounded stupid, and should not work there because of her disability; and (2)

the gay coworker was "too gay," and needed to "man up."  (Pl. Dep. at 114, 116,

120-21, 141.)  In early August, Plaintiff complained about Hampton's comments

to the practice manager at the Center, Anna Burnett, who told her she would look

into the complaints.[3]  (Pl. Dep. at 120, 145-46.)

### 3.   The August 12, 2021 Physical Altercation Between Hampton and Plaintiff

On August 12, 2021, Plaintiff was working a shift at the Center, along with

Hampton and Timothy Wise, another CSR.  (*See* Pl. Dep. at 141.)  Within an hour

of the shift starting, Hampton made inappropriate remarks about one coworker's

sexual orientation and another coworker's disability.  (*Id.* at 141-42.)  Plaintiff told

Hampton she should not make comments like those, to which Hampton replied that

Plaintiff could "suck a dick."  (*Id.* at 143-44.)

Because Burnett was off that day, Plaintiff called Kelley Given, the "on call"

practice manager, to report Hampton's conduct.  (Pl. Dep. at 144); [Doc. 39-5 ¶ 9.]

Plaintiff related what Hampton said, and Given advised her to make the best of the

situation and to let her know if the situation worsened.  (Pl. Dep. at 144.)  Plaintiff

---

[3] Burnett denies that Plaintiff ever made any complaints to her about any harassing or discriminatory behavior that Plaintiff had witnessed or observed. [Doc. 39-4 ¶ 5.]  Because Plaintiff is the nonmoving party, however, the Court must accept Plaintiff's version of the events.

told Given she was "okay to stay" at the Center, as long as the situation did not worsen.  (*Id.* at 145.)

Around two hours later, Plaintiff emailed Ariel Brooks, another practice manager, to complain about feeling "uncomfortable at work."  (Pl. Dep. at 152); [Doc. 56-3 at 49.]  She wrote that "a few inappropriate things" were "indirectly" said to her, and that the "toxic and negative" remarks were causing her to feel unfocused.  [Doc. 56-3 at 49.]  Brooks emailed back, asking if Plaintiff had tried reaching out to Given.  [*Id.* at 48-49.]  Plaintiff responded that she "did reach out earlier" but "more stuff happened" and she was taking a "mental break" because it was too much "to deal with disrespect and negativity."  [*Id.* at 48.]  About ten minutes later, Plaintiff called Given.  (Pl. Dep. at 156.)  Given told Plaintiff that she was sorry that she was uncomfortable and that the company did not condone any type of bullying.  (*Id.*)  Plaintiff told Given she would try to push through to the end of her shift.  (*Id.*)

Later that day, however, things got worse for Plaintiff.  Just after 4:00 p.m., Plaintiff left one of her patients in an exam room without closing the door all the way and walked to a workstation in the common area of the clinic to gather medical

supplies.  (DSMF ¶¶ 52-53, 55-56); [*see* Doc. 40 at 2:35.][4]  She passed Hampton and Wise who were both sitting down at computers behind a counter at the workstation.  [*See* Doc. 40 at 2:35].  Hampton then began to argue with Plaintiff, asking Plaintiff if she was "stupid." (Pl. Dep. at 191-92.)  Plaintiff walked to the counter directly next to Hampton (who was still seated and facing away from Plaintiff) to get gloves and the two continued to argue as Plaintiff put on the gloves. (DSMF ¶ 56); [Doc. 40 at 3:25-3:50.]  According to Plaintiff, Hampton said that Plaintiff was not a qualified medical assistant, called her stupid, and said, "Bitch, I'll kill you." (Pl. Dep. at 193-95.)  Hampton then turned her chair toward Plaintiff, started motioning with her hands, and stood up directly in front of Plaintiff.  (DSMF ¶ 57); [Doc. 40 at 3:50.]  Plaintiff did not step away from Hampton and began making a chopping motion with one hand hitting the other.  (*See* DSMF ¶ 58; Pl. Dep. at 197-98.)  Wise then stood up, walked in between Plaintiff and Hampton to separate them, and told Plaintiff to breathe and to go to another room.  [Doc. 40 at 3:54-4:08]; (Pl. Dep. at 201-02.)  Wise also closed the door to the patient's exam

---

[4] The Court has reviewed a copy of the surveillance footage, which does not have audio, of the relevant incident.  [*See* Doc. 40]; (PSMF ¶ 26.)  References to specific portions of the video are to the elapsed time in the viewing software, rather than the timestamp on the footage itself.  All the employees in the footage, including Plaintiff and Hampton, are wearing masks, so it is hard to discern when anyone is speaking.

room.  [Doc. 40 at 4:08-4:11.]  Hampton sat back in her chair and faced her computer, but she and Plaintiff continued to argue, with Plaintiff standing and leaning over the counter next to Hampton.  [Doc. 40 at 4:05-4:38.]  During this time, Hampton kept calling Plaintiff a "bitch."  (Pl. Dep. at 203.)  The argument was loud enough for the patient to hear.  (DSMF ¶ 62.)

Zaccardo Clark, a nurse practitioner, then came into the common area, approached Plaintiff, stood in front of her, asked her what was wrong, and led her out of the workstation area.[5]  (Pl. Dep. at 208-10); [Doc. 40 at 4:38-4:51.]  Clark told Plaintiff that she should go home and that he would collect her belongings.  (DSMF ¶ 72.)  About a minute and a half later, however, Plaintiff returned to the workstation to get her things.  (*See* Pl. Dep. at 213); [Doc. 40 at 6:23.]  Plaintiff and Hampton began arguing again.  (Pl. Dep. at 215); [Doc. 40 at 6:28.]  Clark stood in front of Plaintiff and guided her away from Hampton as Plaintiff continued to speak to Hampton.  [Doc. 40 at 6:38-6:50.]  Plaintiff then faced away from Hampton to sign out of a computer and Hampton leapt to her feet and charged

---

[5] The parties dispute whether Plaintiff was shouting during the argument. Plaintiff testified that she never raised her voice (Pl. Dep. at 204-06), but Clark testified that both Plaintiff and Hampton were shouting at each other when he walked over to intervene (Dep. of Zaccardo Clark [Doc. 45] at 14-15).

toward Plaintiff.  [*Id.* at 6:53-6:59.]  Both Clark and Wise had to physically restrain Hampton from Plaintiff.  [*Id.* at 6:55-7:00]; (PSMF ¶ 18.)

Plaintiff left for the day and called Given to report the altercation.  (PSMF ¶ 19.)  Given spoke with Clark and Wise to collect information about the incident. (DSMF ¶ 87.)  Given also spoke with Hampton and took a statement from her. (DSMF ¶ 89.)  Given reported the incident to Defendant's HR Department.  (DSMF ¶ 90.)

### 4.    Plaintiff's Termination From Employment

On August 17, 2021, Given emailed Burnett, Jonathan Stokes, the Senior Director of Operations, and Erin Hayes, an HR employee, notes she took on August 12, including a summary of her phone calls with Plaintiff both before and after the altercation.  [Doc. 39-9 ("Given's Written Report") at 24-25.]  Given wrote that Plaintiff told her that this has been Plaintiff's first complaint about Hampton.  [*Id.* at 24.]  Given also wrote that Plaintiff reported that Hampton was "talking poorly" about a lab tech and had referenced another coworker's hearing disability.  [*Id.*]

Later that day, Stokes, Hayes, Burnett, and Given met to discuss the August 12 incident.  (DSMF ¶ 91.)  They decided to terminate Hampton's employment for violating the violence-free workplace policy.  (DSMF ¶ 93.)  The surveillance footage had yet to be reviewed, so Burnett retrieved the footage and shared it with

Stokes and Dr. Cassandra Donnelly, the medical director of the Center.[6]  (DSMF ¶¶ 6, 94-96.)

Meanwhile, Plaintiff emailed Piedmont's Chief of Compliance, Ty Houston, about the altercation, writing that another employee verbally attacked her and tried to "put her hands on me" and that no one had yet "addressed the matter."  [Doc. 39-7 at 30.]  Houston forwarded the email to Burnett and others, writing that he "wanted to follow up regarding the email."  [*Id.* at 29.]  Stokes was the first to respond, writing that "[t]his was addressed" and that Burnett and HR would meet with Plaintiff and Hampton separately.  [*Id.*]  Burnett then responded that Hampton had been terminated, that she had spoken with Plaintiff on the phone, and that she would meet with Plaintiff in-person that Thursday (presumably, August 19, two days later).  [Doc. 39-7 at 28.]

Plaintiff and Defendant offer different accounts of what Burnett said during the phone call Burnett referred to.[7]  But according to Plaintiff—whose account the

---

[6] Unlike the CSRs who reported to the practice managers, providers at the Center (*e.g.*, physicians) reported directly to Dr. Donnelly.  (*See* DSMF ¶ 6.)

[7] The timing of this conversation is unclear from the record.  At her deposition, Plaintiff initially testified that it occurred in the morning of August 17 (Pl. Dep. at 167); however, when confronted with her email to Houston, which she sent at 3:30 p.m., she stated that the conversation must have occurred sometime afterward (*id.* at 169-70).

Court must accept for present purposes—Burnett told her that she had reviewed the footage of the incident along with Stokes and Dr. Donnelly, that they saw Hampton as the aggressor, and that Hampton had been fired.  (Pl. Dep. at 167.)  Plaintiff asked Burnett about her own job, and Burnett responded, "You have nothing to worry about" and that they all agreed Plaintiff's job was "safe."[8]  (*Id.*)

The next day, August 18, Burnett met again with Hayes and Stokes.  (PSMF ¶ 32.)  They discussed that the video showed that "both parties involved in the altercation were engaging" and that there were patients with exam room doors right next to where the altercation occurred.  (Burnett Dep. at 55-56.)  At the end of the discussion, Stokes empowered Burnett to decide what to do with Plaintiff's employment.  (DSMF ¶ 101.)

Burnett made the decision to terminate Plaintiffs employment.  (Burnett Dep. at 117.)  According to Burnett, she made the decision because footage showed Plaintiff engaging in behavior that contributed toward a verbal altercation that escalated to a near physical one within steps of a patient, all in violation of the violence-free workplace policy.  (*Id.* at 60, 117-18.)  Plaintiff disputes Burnett's

---

[8] Burnett denies that she ever told Plaintiff that her job was not in danger. (Dep. of Anna Burnett [Doc. 43] at 49-50.)  As Plaintiff is the nonmoving party, the Court must accept Plaintiff's testimony as true.

reasoning, pointing to their earlier phone conversation in which Burnett told Plaintiff her job was safe. (*See* R-DSMF ¶ 104.)

On August 19, Burnett met with Plaintiff at the Center and advised her that her employment was being terminated. (*See* DSMF ¶ 109; PSMF ¶ 33; Pl. Dep. at 172-73.) Burnett had another manager on speakerphone during this conversation. (Pl. Dep. at 173-74.) According to Plaintiff, the person on speakerphone told her she was being fired because Defendant did not know what Plaintiff was capable of had Hampton put her hands on Plaintiff. (*Id.* at 233-34.)

### B.   Procedural Posture

On August 9, 2022, Plaintiff filed her complaint, asserting claims of retaliatory harassment and retaliatory termination, in violation of Title VII and the ADA. [Doc. 1 at 7-9.] Following discovery, Defendant moved for summary judgment [Doc. 39], Plaintiff responded in opposition [Doc. 47], and Defendant filed a reply [Doc. 51]. The summary judgment motion is now ripe for resolution.

## III.   SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that it is entitled to summary judgment. *Id.* ("The court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). If that burden is met, the burden shifts to the non-moving party, who is required to "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted); *see* Fed. R. Civ. P. 56(c).

When the party responding to a statement has neither refuted nor stated valid objections to the material facts in the statement, those facts are deemed admitted by operation of law. LR 56.1B(2), NDGa.; *Reese v. Herbert*, 527 F.3d 1253, 1267-69 (11th Cir. 2008). When a party denies a statement of fact (in whole or in part), the Court has reviewed the record to determine whether it is disputed and, if so, whether any dispute is material. The Court has also excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, as well as assertions of fact unsupported by a citation to evidence in the record, stated as a legal conclusion, or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B(1), NDGa.; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc) (subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not

14

create genuine issues of material fact to withstand summary judgment); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (same).

## IV.   DISCUSSION

### A.   Retaliatory Harassment

In Count I of her complaint, Plaintiff asserts a claim for retaliatory harassment under Title VII and the ADA.  [Doc. 1 ¶¶ 26-31.]  In response to Defendant's motion for summary judgment, however, Plaintiff "does not contest summary judgment on this claim."  [*See* Doc. 47-1 at 2.]  As a result, it is **RECOMMENDED** that summary judgment be **GRANTED** as to Count I.  Thus, the only substantive claim at issue is Plaintiff's claims retaliatory discharge under Title VII and the ADA, which the Court will discuss presently.

### B.   Retaliatory Discharge

Plaintiff asserts that she was retaliated against in violation of Title VII and the ADA when she was discharged on May 19, 2021.  [Doc. 1 ¶¶ 32-35.] Defendant argues, based on the *McDonnell Douglas*[9] burden-shifting framework, that the claim fails because Plaintiff cannot establish a causal connection between her protected activity and her discharge because her intervening altercation with Hampton severed any causal connection between the two.  [Doc. 39-1 at 14-16.]

---

[9] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

Alternatively, Defendant argues that even if Plaintiff can show a causal connection to establish a prima facie case of retaliation, it had a legitimate, nondiscriminatory reason for terminating her employment—that she violated Defendant's violence-free workplace policy—and Plaintiff cannot show that its reason was pretext for retaliation. [*Id.* at 16-22.]

Plaintiff responds she has presented evidence that permits a reasonable inference of retaliation under the *McDonnell Douglas* framework. [*See* Doc. 47-1 at 14-18.]  As to the causation prong, she argues that her involvement in the altercation did not sever the causal link because just two days before she was fired, Burnett told her that Burnett and others had concluded based on their review of the footage that Plaintiff was not at fault and that her job was safe.  [*Id.* at 14-15.] Plaintiff further contends that a jury could find that Defendant's stated reason for firing her was pretext for retaliation because (1) Burnett told Plaintiff that her job was "safe"; (2) Burnett did not state in her August 17 email to Houston (where she reported Hampton had been fired) that she was also considering terminating Plaintiff's employment; and (3) Burnett's investigation deviated from standard procedures because HR, rather than Burnett, should have conducted the investigation.  [*Id.* at 15-18.]  In the alternative, Plaintiff contends that even if she cannot prevail under the *McDonnell Douglas* framework, she has presented a

"convincing mosaic of circumstantial evidence of retaliation"—including (1) that Burnett told Plaintiff that she would not be fired; (2) that Plaintiff had filed a previous race discrimination suit in the Northern District of Alabama; (3) that just two days before her firing, she escalated her complaints to Houston (the Director of Compliance), asserting that no steps were taken to address the August 12 incident; (4) that Given's summary of her conversations with Plaintiff on August 12 left out that Plaintiff complained of a coworker's anti-gay comments; (5) that Burnett denied that Plaintiff had complained about Hampton's bullying behavior several weeks earlier; and (6) that Defendant did not interview witnesses in an effort to avoid creating a paper trail that Plaintiff could exploit in litigation.  [*Id.* at 22-25.]

On reply, Defendant reiterates that Plaintiff's intervening misconduct severed the causal link between any protected activity and her discharge, and that beyond temporal proximity, there is no evidence of a causal connection.  [Doc. 51 at 3-6.]  As to pretext, Defendant contends that Plaintiff has not rebutted its stated reason for firing her and that none of her contentions is probative of pretext.  [*Id.* at 6-12.]  About Burnett's purported statement that her job was safe in particular, Defendant contends that this statement does not show that retaliation was the real reason for terminating her employment because no protected activity occurred after

that conversation took place.  [*Id.* at 7-8.]  Finally, in response to Plaintiff's convincing mosaic argument, Defendant contends that Plaintiff offers little more than speculation that Plaintiff was terminated in retaliation for engaging in protected activity.  [*Id.* at 12-15.]

The Court takes up these arguments in turn.

### 1.  *McDonnell Douglas*

Both Title VII and the ADA make it unlawful for an employer to retaliate against an employee who opposes discrimination.  42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203(a).  Where, as here, a plaintiff relies on circumstantial evidence to support a claim of unlawful retaliation under Title VII or the ADA, courts apply the three-part *McDonell Douglas* burden shifting framework.  *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (Title VII); *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021) (ADA).  First, a plaintiff must make out a prima facie case of retaliation, showing that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal relationship between the two events.  *Johnson*, 948 F.3d at 1325.  "[V]ery close temporal proximity between a protected activity and an adverse action can create an inference of causation."

*Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023) (quotation marks omitted).

If the plaintiff manages to make out a prima facie case, then the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its actions. *Johnson*, 948 F.3d at 1325.   Should the employer make that showing, then the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for retaliation.   *Id.*   To show that an employer's given reasons are pretextual, a plaintiff must show "both that the reason was false, and that retaliation was the real reason." *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1298 (11th Cir. 2021) (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020)).   In other words, "a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (quoting *Gogel*, 967 F.3d at 1136).   A plaintiff must do more than just quarrel with the wisdom of the decision; "[t]o survive summary judgment, the plaintiff must . . . present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext.   Mere conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

An intervening discovery of employee misconduct may also "sever the causal inference created by close temporal proximity." *Berry*, 84 F.4th at 1309. At all times, the plaintiff retains the ultimate burden of persuading the finder of fact that the defendant acted with discriminatory intent. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### a.    Causal Connection

The Court first takes up Defendant's argument that Plaintiff cannot establish the causation prong of the prima facie case because her altercation with Hampton severed any causal connection between her protected activity and her discharge on August 19.[10] There is ample authority that recognizes that sometimes intervening employee misconduct can be so egregious that it severs the causal chain, defeating a prima facie case of retaliation. For example, in *Hankins v. AirTran Airways, Inc.*, the Eleventh Circuit concluded that the plaintiff's "flagrant act of misconduct"— namely, yelling at a coworker and threatening to "kick his ass"—defeated the temporal proximity between the employee's protected activity and termination because it came after the plaintiff reported "suspected racial bias." 237 F. App'x 513, 521 (11th Cir. 2007). Likewise, in *Ball v. Bd. of Regents of Univ. Sys. of Ga.*,

---

[10] Again, the Court's analysis focuses on the causation prong, as Defendant does not challenge on summary judgment that Plaintiff engaged in protected activity or that she suffered an adverse employment action.

an ADA retaliation case, this Court found that the plaintiff's admission that he falsified timesheets, a terminable offense under the applicable employment policy, was not only properly considered at the prima facie stage of the analysis but was also an intervening act that broke the causal chain between his protected activity and his termination.  No. 1:20-CV-00012-SDG, 2021 WL 4272825, at *3 (N.D. Ga. Sept. 20, 2021).[11]

Even so, the Court hesitates to conclude that the physical altercation necessarily severed ***any*** causal connection because there is a dispute of fact as to whether the altercation was egregious enough to automatically have resulted in Plaintiff's discharge. [Doc. 39-1 at 15-16.]  For starters, Defendant's anti-violence policy allows for a range of disciplinary matters that include, but do not mandate, termination from employment.  [Doc. 56-5 at 64-65.]  In this same vein, Plaintiff's testimony that Burnett told her after reviewing the video of the incident that her job was "safe" supports a finding that engaging in a workplace fight does not lead to automatic dismissal.  Thus, the Court cannot say that Plaintiff's involvement in the altercation would necessarily have resulted in her termination from employment and, thus, severed any causal connection.

---

[11] Plaintiff cites only to cases that deal with temporal proximity generally. None involve intervening acts of misconduct.

Under the circumstances of this case, then, the Court believes that Plaintiff's misconduct is better addressed at the pretext stage, as other courts have done. *See Berry*, 84 F.4th at 1308 (assuming without deciding that plaintiff established a prima facie case of retaliation where defendant uncovered substantial evidence of plaintiff's bullying and misconduct after plaintiff complained of race discrimination); *Feige v. Novitas Sols., Inc.*, No. 3:19-CV-395-MMH-MCR, 2023 WL 34712, at *11 (M.D. Fla. Jan. 4, 2023) (assuming that plaintiff established causation prong despite evidence of plaintiff's intervening violations of company policy and addressing the matter at the pretext stage of the analysis); *Gross-Jones v. Mercy Med.*, 874 F. Supp. 2d 1319, 1345 (S.D. Ala. 2012) (evaluating employee's intervening misconduct at pretext stage of analysis rather than as part of the prima facie case).   After all, what Defendant is really arguing is that the intervening misconduct provided a legitimate, nonretaliatory reason for her discharge.   Because of the significant overlap with the pretext stage of the analysis, the Court will assume that the relatively close temporal connection between the protected activity and Plaintiff's discharge is enough to establish the causation

prong of the prima facie case and instead deal with her intervening misconduct at the pretext stage of the analysis.[12]

### b.    Pretext

Assuming, then, that Plaintiff has met the causality prong of a prima facie case, her retaliation claim still fails under the rest of the *McDonnell Douglas* framework.  Defendant has provided a legitimate, non-discriminatory reason for the termination—that she violated Defendant's violence-free workplace policy when she engaged in an argument loud enough for a patient to hear and persisted in that argument even after being guided out of the room.  (*See* DSMF ¶ 62; Pl. Dep. at 213-140); [Doc. 40 at 6:23.]  "This reason might legitimately motivate a reasonable employer to terminate an employee."  *Berry*, 84 F.4th at 1309.  And Plaintiff has failed to create a genuine dispute of material fact regarding whether that reason was pretextual.

Plaintiff argues that she can show pretext based on the following evidence: (1) Burnett's August 17 phone call, during which Burnett stated that Plaintiff's job

---

[12] Plaintiff cites *Herren v. La Petite Academy, Inc.*, 2023 WL 4842346 (11th Cir. July 28, 2023), seemingly for the proposition that Defendant must provide proof "beyond dispute" that the protected activity and the adverse actions were wholly unrelated.  [*See* Doc. 47-1 at 14.]  But *Herren* analyzed an affirmative defense to a Family and Medical Leave Act interference claim, not the causation element necessary to establish a Title VII or ADA retaliation claim which, of course, Plaintiff has the burden to establish.

was "safe"; (2) Burnett's August 17 email that references Hampton's firing but does not state that Walker's status was under review; and (3) Defendant's failure to conduct routine questioning of witnesses to the August 12 altercation. [Doc. 47-1 at 15-18.] This evidence, taken together and in the light most favorable to Plaintiff, fails to establish pretext.

First, Burnett's alleged statement to Plaintiff on August 17 that her job was "safe" does not show pretext because it does not suggest that the real reason for Plaintiff's termination was retaliation. *See Berry*, 84 F.3d at 1309 ("[T]o establish pretext, an employee must prove that the employer's reason 'was false' and that 'retaliation was the real reason.'") (citation omitted). At the time Burnett supposedly made the statement, Plaintiff had already engaged in protected activity by complaining directly to Burnett about Hampton (Pl. Dep. at 121) and did not engage in any further protected activity.[13] And the record shows that as of August 17, a decision had not been finally made with respect to Plaintiff's employment. On August 18, Burnett met again with Hayes and Stokes. (PSMF ¶ 32.) They

---

[13] Notably, Plaintiff testified that she sent her email to Houston complaining about inaction before she spoke with Burnett, so to the extent that Plaintiff asserts that the email was somehow protected activity, it occurred before the phone call. (*See* Pl. Dep. at 168-69.) Further, Plaintiff fails to explain how that email could be considered protected activity to begin with. [*See* Doc. 47-1 at 13.]

discussed that the video showed that "both parties involved in the altercation were engaging" and that there were patients with exam room doors right next to where the altercation occurred.  (Burnett Dep. at 55–56.)  At the end of the discussion, Stokes empowered Burnett to decide what to do with Plaintiff's employment. (DSMF ¶ 101.)  Construing the evidence in the light most favorable to Plaintiff, even if Burnett told Plaintiff on August 17 that her job was "safe," Burnett's changing of her position shortly afterward does not demonstrate the kind of weakness in Defendant's reason for firing Plaintiff that could lead a reasonable factfinder to find the reason unworthy of credence or that retaliation was the real reason she was fired.  *See Tolar*, 997 F.3d at 1298.

Second, as to Burnett's August 17 email, Plaintiff argues that a "jury could find that if the investigation as to [Plaintiff's] fate was unresolved, Burnett would have had no good reason to leave that detail out of an internal email within management ranks." [Doc. 47-1 at 17.]  This argument is unpersuasive.  Although Burnett's August 17 email did not specifically state that Plaintiff's employment status was under review, it did state that Burnett had spoken with Plaintiff and planned to meet with her in person that Thursday.  And it gave no indication that somehow Plaintiff was cleared of wrongdoing.  Again, this is not the kind of evidence that demonstrates that a reasonable factfinder could find Defendant's

proffered reason for firing Plaintiff unworthy of credence. *See Tolar*, 997 F.3d at 1298.

Third, as to Defendant's supposed failure to conduct routine questioning of witnesses to the August 12 altercation, the record establishes that statements were taken from witnesses and reported to HR. (*See* DSMF ¶¶ 87, 89, 90; Doc. 47-1 at 17 n.6.)

Simply put, Plaintiff has not presented concrete evidence that shows that Defendant's proffered reason for her employment termination is mere pretext. Accordingly, her Title VII and ADA retaliation claims fail under the *McDonnell Douglas* framework.

### 2.    Convincing Mosaic

The *McDonnell Douglas* framework is "not the only way to prove retaliation" because "an employee can prove retaliation with circumstantial evidence so long as the evidence raises a reasonable inference of retaliatory intent." *Berry*, 84 F.4th at 1310. This approach has been called the "convincing-mosaic framework," though it is not a legal test or framework. *Id.* at 1311. Instead, it is a metaphor for the overarching standard at summary judgment—"whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee." *Id.* The Eleventh Circuit has "identified three nonexclusive

26

categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Id.*

Plaintiff argues she has presented a convincing mosaic of circumstantial evidence that raises a reasonable inference of retaliation. [Doc. 47-1 at 22-25.] As evidence, she points to: (1) Burnett contradicting her initial statement that Plaintiff's job was safe; (2) Burnett seemingly changing her mind after speaking with HR personnel, who would have conducted a background check on her and could have seen that Plaintiff previously had filed a race discrimination lawsuit against another employer; (3) the fact that she was fired two days after emailing Stokes that no steps had been taken to address the August 12 altercation; (4) the fact that Given's Written Report leaves out that Plaintiff complained about anti-gay bias; (5) Burnett's denial that Plaintiff did not complain about Hampton weeks before the altercation; and (6) Defendant's failure to have HR employees conduct the investigation.[14]   [*Id.*]

---

[14] Plaintiff does not argue—or present any evidence to suggest—that similarly situated employees were better treated than her.  After all, Hampton, who

The Court looks at this evidence in turn.  First, as discussed above, Burnett's comment to Plaintiff that her job was "safe" does not raise a reasonable inference of retaliatory intent.  Next, Plaintiff's suggestion that HR "would have had access to [her] litigation history and might well have brought [the previous discrimination lawsuit] up" to Burnett is purely speculative, as is her further attenuated assertion that such information somehow informed Burnett's decision.  *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1055 (11th Cir. 2020) (noting that "speculation is not evidence").  There is simply nothing in the record to support that Burnett was told about Plaintiff's previous lawsuit against a different employer.  In fact, the background check report provided to Defendant when Plaintiff was hired did not mention that lawsuit and Plaintiff provides no evidence that Burnett—or anyone else—knew about the prior lawsuit.  [*See* Doc. 51-1 at 5-7.]

Next, the timing of Plaintiff's August 17 email to Houston in which she complained that "[n]o one has yet addressed" the altercation between Plaintiff and Hampton about the investigation does not raise a reasonable inference of retaliatory

---

did not engage in protected activity, was fired for engaging in the same conduct. Plaintiff also concedes that "there is no specific record evidence of retaliatory animus, such as prior threats to her that complaining was discouraged, or that other employees who have raised complaints at [Defendant] have suffered reprisals." [Doc. 47-1 at 18.]

intent.  [*See* Doc. 39-7 at 30.]  At that point Defendant had already fired Hampton, and Burnett had scheduled an in-person meeting with Plaintiff about the incident.  [*See id.* at 28.]  Plaintiff's theory that "a jury could reason that [Plaintiff's] propensity for complaints could well have been a subject of discussion and concern when Burnett, Stokes, and Hayes met" is purely speculative and without support in the record.  [*See* Doc. 47-1 at 24.]

Also, Plaintiff's assertion that Given's Written Report is somehow evidence of retaliatory intent is unpersuasive.  Plaintiff merely speculates that Given excluded Plaintiff's complaint of anti-gay remarks from her report out of concern for future litigation.  [*See* Doc. 49-1 at 24.]  But that theory is undermined by the fact that Given did include Plaintiff's complaint about Hampton remarking on a coworker's hearing disability.  [*See* Doc. 39-9 at 24-25.]  Further, Given was not the decisionmaker; thus, her intent is simply not relevant.  *See Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) ("statements made by nondecisionmakers" do not demonstrate discriminatory intent) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)); *Bozeman v. Per-Se Techs., Inc.*, 456 F. Supp. 2d 1282, 1353 (N.D. Ga. 2006) (finding that statements made by nondecisionmakers unrelated to the decisional process at issue did not demonstrate retaliatory intent).

Next, the fact that Burnett denies Plaintiff ever complained about Hampton before August 12 also does not raise an inference of retaliatory intent. It simply presents a dispute of fact as to whether Plaintiff engaged in protected activity—an issue that Defendant does not contest on summary judgment.

Finally, as discussed above, Plaintiff argues that Defendant failed to use its HR department to interview witnesses, but the record simply does not show that Defendant deviated from its procedures in a retaliatory manner. The record shows that Given spoke to witnesses and there was an investigation, including a review of surveillance video, before Plaintiff's employment termination.

In sum, Plaintiff's theories are largely built from unfounded speculation, which cannot permit a reasonable factfinder to find that Defendant retaliated against her. The circumstantial evidence cited by Plaintiff, viewed as a whole and in the light most favorable to her, does not create a reasonable inference of intentional retaliation.

## V.   CONCLUSION

In conclusion, Plaintiff has not presented sufficient evidence of retaliation to survive summary judgment. For all these reasons, it is **RECOMMENDED** that Defendant's motion for summary judgment, [Doc. 39], be **GRANTED**. Plaintiff's motion to strike [Doc. 53] is **DENIED**.

SO ORDERED AND RECOMMENDED this 6th day of December, 2023.

JOHN K. LARKINS III
United States Magistrate Judge